UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

GRACIELA SANCHEZ, individually, and on behalf of other members of the general public similarly situated,

Plaintiff,

v.

ABBOTT LABORATORIES, an Illinois corporation; and DOES 1 through 100, inclusive;

Defendant.

No. 2:20-cv-01436-TLN-AC

ORDER

This matter is before the Court pursuant to Plaintiff Graciela Sanchez's ("Plaintiff") Motion to Remand. (ECF No. 6.) Defendant Abbott Laboratories ("Defendant") filed an opposition. (ECF No. 8.) Plaintiff filed a reply. (ECF No. 9.) Also before the Court is Defendant's Motion to File a Supplemental Opposition. (ECF No. 19.) Plaintiff filed an opposition. (ECF No. 26.) Defendant filed a reply. (ECF No. 29.) Having carefully considered the briefing filed by both parties, the Court hereby DENIES Plaintiff's motion and DENIES Defendant's motion as moot.

///

///

///

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant employed Plaintiff and other individuals as hourly-paid or non-exempt employees within California. (ECF No. 1-1 at 13.) On May 4, 2020, Plaintiff filed this putative class action in Solano County Superior Court and asserted the following claims: (1) failure to pay overtime wages, Cal. Labor Code §§ 510 and 1198; (2) meal period violations, *id.* §§ 226.7, 512(a); (3) rest break violations, *id.* § 226.7; (4) failure to pay minimum wages, *id.* §§ 1194, 1197; (5) failure to timely pay wages upon termination, *id.* §§ 201, 202; (6) wage statement penalties, *id.* § 226(a); (7) failure to reimburse business-related expenses, *id.* §§ 2800, 2802; and (8) unfair business practices, Cal. Bus. & Prof. Code § 17200. (*See* ECF No. 1-1 at 7–31.)

On July 16, 2020, Defendant removed the case to this Court under the Class Action Fairness Act ("CAFA"). (ECF No. 1.) Plaintiff moved to remand on August 17, 2020. (ECF No. 6.) Defendant submitted an opposition (ECF No. 8), and Plaintiff filed a reply (ECF No. 9).

# II. STANDARD OF LAW

A civil action brought in state court, over which the district court has original jurisdiction, may be removed by the defendant to federal court in the judicial district and division in which the state court action is pending. 28 U.S.C. § 1441(a). CAFA gives federal courts original jurisdiction over certain class actions only if: (1) the class has more than 100 members; (2) any member of the class is diverse from the defendant; and (3) the amount in controversy exceeds $5 million, exclusive of interest and costs. *See* 28 U.S.C. §§ 1332(d)(2), (5)(B).

Congress enacted CAFA "specifically to permit a defendant to remove certain class or mass actions into federal court" and intended courts to interpret CAFA "expansively." *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015). Although removal statutes are generally to be strictly construed against removal, *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992), "no antiremoval presumption attends cases invoking CAFA." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014). Nonetheless, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded" to state court. 28 U.S.C. § 1447(c).

///

A defendant seeking removal under CAFA must file in the federal forum a notice of removal "containing a short and plain statement of the grounds for removal." *Dart Cherokee*, 574 U.S. at 83 (quoting 28 U.S.C. § 1446(a)). The notice of removal "need not contain evidentiary submissions," rather a defendant's "plausible allegation that the amount in controversy exceeds the jurisdictional threshold" suffices. *Id.* at 84, 89. When "a defendant's assertion of the amount in controversy is challenged . . . both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Id.* at 88. The parties may submit evidence outside the complaint including "affidavits or declarations or other 'summary-judgment-type evidence relevant to the amount in controversy at the time of removal.'" *Hender v. Am. Directions Workforce LLC*, No. 2:19-cv-01951-KJM-DMC, 2020 WL 5959908 at *2 (E.D. Cal. Oct. 7, 2020) (quoting *Singer v. State Farm Mut. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997)).

When "the defendant relies on a chain of reasoning that includes assumptions to satisfy its burden of proof, the chain of reasoning and the underlying assumptions must be reasonable, and not constitute mere speculation and conjecture." *Id.* (citing *Ibarra*, 775 F.3d at 1197–99). "CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." *Ibarra*, 775 F.3d at 1198. Then "the district court must make findings of jurisdictional fact to which the preponderance standard applies." *Dart Cherokee*, 574 U.S. at 89 (internal citation omitted). However, this burden is not daunting because "a removing defendant is not obligated to 'research, state, and prove the plaintiff's claims for damages.'" *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1204–05 (E.D. Cal. 2008) (internal citation omitted); *see also Muniz v. Pilot Travel Centers LLC*, No. CIV. S-07-0325FCDEFB, 2007 WL 1302504, at *5 (E.D. Cal. May 1, 2007) (holding that a removing defendant is not obligated "to support removal with production of extensive business records to prove or disprove liability and/or damages with respect to plaintiff or the putative class members at this premature (pre-certification) stage of the litigation").

///

### III. ANALYSIS

Plaintiff argues Defendant has failed to show by a preponderance of evidence that the amount in controversy exceeds $5 million. (*See* ECF No. 6.) In opposition, Defendant argues the amount in controversy easily exceeds $5 million based on Plaintiff's own allegations and the declaration of Natalie Armstrong ("Armstrong"), Defendant's Human Resources Manager. (ECF No. 8 at 10–22.) The Court will first address whether Armstrong's declaration — paired with the allegations in the Complaint — is sufficient to support removal. The Court will then address whether the amount in controversy is satisfied.

#### A. Armstrong's Declaration

Plaintiff argues Armstrong's declaration alone is insufficient to establish the amount in controversy because it lacks foundation and corroborating documents such as payroll records. (ECF No. 6 at 8–23.) The Court disagrees.

Armstrong's declaration establishes the following for the putative class during the Class Period: the number of workweeks, the number of scheduled hours, and the average hourly pay rate for the putative class. (*See generally* ECF No. 1-3.) Armstrong declares that her statements are based on her personal knowledge of Defendant's business records, including personnel files and payroll records of Defendant's current and former employees. (*Id.* at 2–3.) She further declares that, at all times, the putative class members were scheduled to work approximately eight hours per day and five days per week. (*Id.* at 4–5.) Between May 4, 2016 and July 16, 2020 (the "Class Period"), Defendant employed at least 100 putative class "employees" who were compensated per hour of work and paid on a weekly basis. (*Id.* at 3–4.) In addition to putative class employees, at least 100 putative class "workers" were assigned to work for Defendant during the Class Period.[1] (*Id.* at 4–5.) Putative class employees worked approximately 36,106 workweeks and were paid an average of $21.87 per hour during the Class Period. (*Id.* at 4.)

---

[1] Putative class "employees" were or are employed by Defendant as full-time employees. (ECF No. 1-3 at 3–4.) Putative class "workers" were or are contingent workers employed by a third-party and assigned to work for Defendant. (*Id.* at 4–5.) The Court will calculate the amount in the controversy based only on the putative class "employees," because, as will be discussed, the $5 million threshold is satisfied without considering the putative class "workers."

4

Putative class workers worked approximately 5,619 workweeks and their average hourly bill rate was $27.32 per hour. (*Id.* at 5.) At least 69 putative class employees and 135 putative class workers had their employment or assignment end on or after May 4, 2017. (*Id.* at 4–5.) Additionally, putative class employees often worked overtime hours for which they were paid premium rates. (*Id.* at 2.)

Plaintiff cites *Garibay v. Archstone Communities LLC*, 539 Fed. App'x 763 (9th Cir. 2013), to argue that Armstrong's declaration, without more, is insufficient. In *Garibay*, the court found that a declaration from a payroll supervisor was not sufficient to establish the amount in controversy. *Id.* at 764. However, several courts have emphasized that *Garibay* is an unpublished opinion and therefore nonbinding. *See Herrera v. Carmax Auto Superstores California, LLC*, No. EDCV14776MWFVBKX, 2014 WL 12586254, at *3 (C.D. Cal. June 12, 2014) (finding many courts since *Garibay* have departed from its holding and permit defendants to assume "violation rates that are supported directly by, or reasonably inferred from, the allegations of the complaint"); *Mejia v. DHL Express (USA), Inc.*, CV 15-890-GHK JCX, 2015 WL 2452755 (C.D. Cal. May 21, 2015) (declining to follow *Garibay* because it is an unpublished opinion, has no precedential weight, and is inconsistent with *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395 (9th Cir. 2010)); *Patel v. Nike Retail Services, Inc.*, 58 F. Supp. 3d 1032, 1041 n.4 (N.D. Cal. 2014) (deciding to follow the rule in *Lewis,* despite its inconsistencies with *Garibay,* because it is a published opinion). This Court similarly finds "*Garibay* is of limited utility here because it contains little discussion of . . . the appropriate evidence that the defendants should have produced to establish the amount in controversy." *Herrera*, 2014 WL 12586254, at *3. Moreover, as other courts have pointed out, the Ninth Circuit seemingly declined to follow *Garibay* in *Lewis*. In *Lewis*, the court vacated the district court's remand order and held that the defendant's declaration alone had sufficiently shown by a preponderance of the evidence that the amount in controversy exceeded $5 million when the plaintiff produced no evidence to the contrary and the complaint supported such an assumption. 627 F.3d at 398, 401–02.

As in *Lewis*, many district courts in the Ninth Circuit have held that declarations can be sufficient evidence in light of allegations made in complaints. *See Avila v. Rue21, Inc.*, 432 F.

Supp. 3d 1175, 1186 (E.D. Cal. 2020) (finding "there is no [ ] bright-line rule" establishing whether a declaration, without foundation and corroborating documents, is *per se* insufficient); *Cavada v. Inter-Cont'l Hotels Grp., Inc.*, 2019 WL 5677846, at *2–9 (S.D. Cal. Nov. 1, 2019) (finding that declarations of the director of human resources, along with allegations in the complaint, sufficiently demonstrate the amount in controversy exceeds $5 million); *Alvarez v. Office Depot, Inc.*, CV177220PSGAFMX, 2017 WL 5952181, at *3 (C.D. Cal. Nov. 30, 2017) (holding "that the evidence Defendant provides through [its Lead Human Resources Business Partner's] declaration is acceptable for purposes of determining the CAFA amount in controversy."); *Moore v. Addus HealthCare, Inc.*, No. 19-CV-01519-HSG, 2019 WL 3686584, at *3 (N.D. Cal. Aug. 7, 2019) (finding that a declaration from a human resources manager executive "who attests to basic facts based on her normal business responsibilities and her personal review of Defendants' business records" is sufficient).

Accordingly, the Court finds a declaration from a knowledgeable person, such as Armstrong, that uses averages of the putative class, *can* be sufficient to establish amount in controversy depending on the nature of the allegations in the complaint.[2]

        B.      <u>Amount in Controversy</u>

                i.      *Meal Period Violation*

Defendant uses a 60% violation rate (three of five meal periods per workweek being improper) to calculate the amount in controversy for the missed meal period claim.[3] (ECF No. 8

---

[2] Plaintiff also argues that Armstrong's declaration is "incomplete" because it relies on class averages. (ECF No. 6 at 25.) However, using the putative class's average hourly pay rate when calculating the amount in controversy under CAFA is proper because the key issue is whether the entire class — not each individual — surpasses the requisite threshold. *See, e.g.*, *Sanchez v. Russell Sigler, Inc.*, CV1501350ABPLAX, 2015 WL 12765359 (C.D. Cal. Apr. 28, 2015) ("For [calculating the amount in controversy for the entire putative class], it is hard to imagine a more useful metric than the putative class's average hourly wage."). Therefore, Armstrong's use of averages within her declaration is proper.

[3] Defendant also asserts a 100% assumption rate is reasonable under the holding in *Bryant v. NCR Corp.*, 284 F. Supp. 3d 1147 (S.D. Cal. 2018) (finding an "assumption of a 100 percent violation rate may have been reasonable" based on the "pattern and practice" allegations in the complaint). However, the Court disagrees that a 100% violation rate is reasonable given the

6

at 14–16.) Defendant bases its violation rate assumption on Plaintiff's allegations of a "pattern and practice" of violations and Armstrong's declaration. (ECF No. 8 at 10.) Plaintiff argues that a 60% violation rate is unreasonable given the wording of her claim that Defendant failed to compensate some "class members (but not all)" for missed meal periods. (ECF No. 6 at 15.)

At the outset, "Defendant is not 'required to comb through its records to identify and calculate the exact frequency of violations.'" *Andrade*, 2019 WL 4855997, at *4 (quoting *Lopez v. Aerotek, Inc.*, 2015 WL 2342558, at *3 (C.D. Cal. May 14, 2015)). While a 100% violation rate has been considered unreasonable when a complaint alleges a "pattern and practice" of violations, *Ibarra*, 775 F.3d at 1199, courts in the Ninth Circuit have frequently held a violation rate between 20% and 60% to be reasonable when the plaintiff claims a "pattern and practice" of violations. *See, e.g.*, *Hender*, WL 5959908, at *8 (finding a 20% violation rate reasonable when a plaintiff "claims a 'policy and practice' of denying employees meal and rest breaks"); *Olson v. Becton, Dickinson & Co.*, No. 19CV865-MMA (BGS), 2019 WL 4673329, at *4 (S.D. Cal. Sept. 25, 2019) (finding a 25% violation rate to be appropriate based on the plaintiff's "pattern and practice" allegation); *Elizarraz v. United Rentals, Inc.*, 218CV09533ODWJC, 2019 WL 1553664, at *3–4 (C.D. Cal. Apr. 9, 2019) (using a 50% violation rate for meal period claim and 30% violation rate for rest period claim); *Bryant,* 284 F. Supp. 3d at 1151 (using a 60% violation rate for meal period claim and 30% violation rate for rest period claim); *Alvarez*, 2017 WL 5952181, at *3 (using a 60% violation rate for meal period claim).

Here, as in the foregoing cases, Plaintiff alleges a "pattern and practice" of meal period violations. Thus, a 60% violation rate is reasonable. However, even if the Court applied a violation rate of 40% — a median between 20% and 60% — the amount in controversy would still be sufficient to surpass the $5 million threshold under CAFA with Plaintiff's other claims. Therefore, based on the allegations in the Complaint, Armstrong's declaration, and lack of any contrary evidence from Plaintiff, the maximum amount Plaintiffs could reasonably recover for their meal period claim using a 40% violation rate, excluding putative class workers, is as

---

holding in *Ibarra*, 775 F.3d at 1198–99 ("[A] 'pattern and practice' of doing something does not necessarily mean always doing something.").

7

follows: 36,106 (workweeks) X $21.87 (average wage per hour) X 2 (number of assumed meal period violations per week) = $1,579,276.44.

### ii. Rest Period Violations

Defendant uses a 30% violation rate (three of ten rest periods per week being improper) to calculate the amount in controversy for the missed rest period claim. (ECF No. 8 at 14–16.) Courts in the Ninth Circuit have found a 10% to 30% violation rate to be reasonable when the plaintiff claims a "pattern and practice" of rest period violations. *See Hender,* 2020 WL 5959908 (finding a rest period violation rate of 10%); *Cavada*, 2019 WL 5677846, at *8 (finding a 10% violation rate is a reasonable assumption where the complaint alleged a "pattern and practice" of meal and rest period violations); *Elizarraz*, 2019 WL 1553664, at *3-4 (finding a 25% violation rate is a reasonable assumption where the complaint alleges a "pattern and practice" of violations); *Bryant*, 284 F. Supp. 3d at 1151–52 (finding a rest period violation rate of 30% reasonable when the complaint alleges a "pattern and practice" of violations).

Here, Plaintiff alleges Defendant engaged in a "pattern and practice" of denying Plaintiffs' rest periods. (ECF No. 1-1 at 20–22.) Based on Plaintiff's "pattern and practice" allegations, Armstrong's declaration, and lack of any evidence to the contrary, the Court finds a violation rate of 20% — a median between 10% and 30% — to be reasonable. Therefore, the maximum amount Plaintiffs could reasonably recover for their rest period claim using a 20% violation rate, excluding putative class workers, is as follows: 36,106 (workweeks) X $21.87 (average wage per hour) X 2 (number of assumed rest period violations per week) = $1,579,276.44.

### iii. Failure to Pay Overtime Wages

Defendant uses a 20% violation rate (one improperly paid overtime hour per workweek) to calculate the amount in controversy for the failure to pay overtime claim. (ECF No. 8 at 17.)

Plaintiff alleges Defendant engaged in a "pattern and practice" of failing to pay overtime wages to "Plaintiff and other class members (but not all)" and seeks "general *unpaid* wages at overtime compensation." (ECF No. 1-1 at 17, 27 (emphasis added).) Courts in this Circuit have often found a 20% violation rate (one unpaid overtime hour per week) a reasonable and "conservative estimate" when plaintiff alleges a "policy and practice" of failing to pay

overtime wages.  *See, e.g.*, *Hender*, 2020 WL 5959908, at *8.  Here, as in *Hender*, a 20% violation rate is reasonable because Plaintiff alleges a "pattern and practice" of violations and no contrary evidence showing otherwise exists.

Therefore, based on the allegations in the Complaint, Armstrong's declaration, and lack of any contrary evidence, the maximum amount Plaintiffs could reasonably recover for this claim assuming one hour of overtime was not paid per workweek (20% violation rate), excluding putative class workers, is as follows: 36,106 (workweeks) X $21.87 (average wage per hour) X 1.5 (overtime wage multiplier) X 1 (number of assumed overtime hours per workweek) = $1,184,457.33.[4]

### iv. Wage Statement Penalties

Plaintiff further alleges Defendant failed to provide employees with accurate wage statements.  (ECF No. 1-3 at 22–23.)  Under California law, when an employer fails to provide an accurate wage statement, an employee may seek penalties of $50 for the initial pay period in which a violation occurs and $100 for each violation in a subsequent pay period, not to exceed an aggregate penalty of $4,000 per employee.  Cal. Lab. Code § 226(e).  Using a 100% violation rate, Defendant calculated inaccurate wage statement penalties of at least $693,850 for putative class employees.  (ECF No. 8 at 18.)

Inaccurate wage statement penalties are derivative of meal and rest period violations.  *See Cavada*, 2019 WL 5677846, at *8 ("[S]ince one missed meal and rest period was reasonable, that would mean that every wage statement was inaccurate and subject to the penalties.").  Therefore, when meal period and rest period violation rates are found reasonable, courts have held a 100% wage statement inaccuracy assumption may also be reasonable.  *See Nunes*, 2019 WL 4316903, at *2–3 (finding a 100% wage inaccuracy violation rate reasonable when at least one meal period and one rest period violation are also reasonable); *Cavada*, 2019 WL 5677846, at

---

[4] Plaintiff's allegations do not specify if Defendant never paid class members for their overtime work or simply failed to pay class members at the appropriate overtime rate.  (ECF No. 1-1 at 27.)  Because Plaintiff offers minimal guidance and broadly seeks "unpaid" overtime, Plaintiffs arguably could recover the amount reflecting Defendant never paid class members for their overtime work.

*8 (finding that "since one missed meal and rest period was reasonable, that would mean that every wage statement was inaccurate and subject to penalties.").

As discussed above, the Court finds the assumed violation rates to be reasonable for Plaintiff's meal period, rest period, and overtime claims. Thus, the Court finds a 100% violation rate for inaccurate wage statement penalties is also reasonable. Therefore, the amount Plaintiffs could reasonably recover for inaccurate wage statement penalties, excluding putative class workers, is as follows: 161 (putative class employees who each received 41 or more wage statements) X $4,000 (statutory cap) + [25 (putative class employees who each received less than 41 wage statements) X $50 (penalty for initial violation)] + [486 (total subsequent violations for the 25 putative class employees who each received less than 41 wage statements) X $100 (penalty for subsequent violations)] = $693,850.

In sum, Defendant's estimates, which are supported by the language in the Complaint and Armstrong's declaration, reasonably yield an amount in controversy of $5,036,860.21 for the meal period, rest period, failure to pay overtime, and inaccurate wage statement claims for the putative class. The Court applied violation rates less than what other courts in the Ninth Circuit have held to be reasonable. Moreover, the stated amount in controversy does not account for putative class "workers," waiting time penalties, or attorney's fees — amounts that, if included, would bring the amount in controversy in greater excess of $5 million. Therefore, the Court finds Defendant has proven by a preponderance of the evidence that the amount in controversy in this case exceeds $5 million as required by CAFA.

**IV. CONCLUSION**

For the reasons set forth above, the Court DENIES Plaintiff's Motion to Remand. (ECF No. 6.) Further, the Court DENIES Defendant's Motion to File a Supplemental Opposition as moot. (ECF No. 19.)

IT IS SO ORDERED.

DATED: June 29, 2021

Troy L. Nunley
United States District Judge